

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GARY KOSSEFF, Individually and On Behalf of All Others Similarly Situated, | ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) ) |
| MBIA, INC., GARY C. DUNTON and C. EDWARD CHAPLIN, | ) ) ) |
| Defendants. | ) ) ) |

**08 CV 2362**

CIVIL ACTION NO.

# JUDGE KARAS

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Gary Kosseff ("Plaintiff"), alleges the following based upon the investigation of Plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by MBIA, Inc. ("MBIA" or the "Company"), as well as securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company and media reports about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a class action on behalf of all persons who suffered injury through their transactions in MBIA securities between January 30, 2007 and January 9, 2008 (the "Class Period"), inclusive, excluding Defendants and their privies, seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      MBIA provides financial guarantee insurance, investment management services, and municipal and other services to public finance and structured finance clients on a global basis. MBIA's business relies upon its ability to maintain its triple-A insurance financial strength rating. A

reduction in MBIA's rating from any of the major ratings agencies would materially affect MBIA's financial condition and future business.

3.      During the Class Period, MBIA issued materially false and misleading statements regarding its exposure to collateralized debt obligations ("CDOs"), residential mortgage-backed securities ("RMBS") and the subprime market.  Despite months of speculation regarding the Company's exposure to assets of this sort, Defendants continually assured the market that its risk exposure was materially lower and safer than it actually was. On December 19, 2007, after the close of the market, MBIA shocked investors when it disclosed that it was exposed to $8.14 billion of so-called "CDO-squared securities" which repackage other CDOs and RMBS linked to subprime mortgages.  On this news, the Company's shares fell $7.07 per share, or over 26 percent, to close on December 20, 2007 at $19.95 per share, on unusually heavy trading volume.

4.      Just a few weeks later, on January 8, 2008, MBIA's stock price plummeted again as market analysts downgraded MBIA stock in light of its $8.14 billion exposure to CDO-squared securities.  On January 9, 2008, MBIA stock declined further when the Company disclosed the steps it was taking to improve its deteriorating capital positions and estimated a $737 million loss for the fourth quarter of 2007.  Also, MBIA disclosed that it had discussions with the SEC in response to informal inquiries regarding MBIA's failure to disclose its true exposure to CDOs and RMBS.

## JURISDICTION AND VENUE

5.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

6.      This Court has jurisdiction over the subject matter of this action pursuant to § 27 of

2

the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

7.      Venue is proper in this Judicial District pursuant to § 27 of the Exchange Act, 15

U.S.C. § 78aa and 28 U.S.C. § 1391(b). Many of the acts and transactions alleged herein, including

the dissemination of materially false and misleading information, occurred in substantial part in this

Judicial District.

8.      In connection with the acts, conduct, and other wrongs alleged in this complaint,

Defendants, directly, or indirectly, used the means and instrumentalities of interstate commerce,

including but not limited to, the United States mails, interstate telephone communications, and the

facilities of the national securities exchange.

## PARTIES

9.      Plaintiff, Gary Kosseff, as set forth in the accompanying certification, sold MBIA put

options during the Class Period and was damaged thereby.

10.     Defendant MBIA is a Connecticut corporation with its principal executive offices

located at 113 King Street, Armonk, New York 10504. MBIA describes itself as a leading financial

guarantor and provider of specialized financial services intended to meet the credit enhancement,

financial and investment needs of public and private sector clients, domestically and internationally.

MBIA trades on the New York Stock Exchange under the ticker symbol MBI and has more than 125

million shares outstanding.

11.     Defendant Gary C. Dunton ("Dunton") was at all relevant times the Company's Chief

Executive Officer, President and Chairman of the Board of Directors.

12.     Defendant C. Edward Chaplin ("Chaplin") was at all relevant times the Company's

Chief Financial Officer and Vice-Chairman of the Board of Directors.

3

13.     Defendants Dunton and Chaplin are collectively referred to hereinafter as the "Individual Defendants."

14.     Defendants Dunton and Chaplin, by reason of their management positions and membership and ownership of the Company's stock, were at all relevant times controlling persons of MBIA within the meaning of Section 20(a) of the Exchange Act. These Defendants had the power and influence to cause MBIA to engage in the unlawful acts and conduct alleged herein, and did exercise such power and influence.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

15.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who suffered injury through their transactions in MBIA securities between January 30, 2007 and January 9, 2008, inclusive. Excluded from the Class are Defendants, the officers, and directors of the Company, members of their immediate families and their legal representatives, heirs, successors, or assigns and any entity in which any Defendant has or had a controlling interest.

16.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, MBIA's securities were actively traded on the New York Stock Exchange. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by MBIA or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

4

17.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

18.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

19.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

> (a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;
>
> (b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, and management of MBIA; and
>
> (c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

20.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### Background

21.     MBIA is the nation's largest guarantor of financial risk, insuring over $650 billion in municipal bonds and other debt instruments. Nearly all of the Company's revenue and net income is generated by its financial guarantee business through its wholly owned subsidiary MBIA Insurance Corporation (referred to collectively with MBIA, Inc. as "MBIA" or the "Company").

22.     Maintaining its triple-A rating is essential to MBIA's bond insurance business, because without the highest credit rating, MBIA would be unable to offer bond issuers a favorable rate. The Company has continually admitted that maintaining its triple-A rating is critical to the continued success of its business, referring to it as MBIA's Good Housekeeping Seal of Approval." Defendant Dunton stated that: "MBIA's true constant – our North Star, if you will – is our commitment to protecting our triple-A ratings." In its Form 10-K filed with the SEC on March 1, 2007, MBIA noted that: "MBIA Corp. has triple-A financial strength ratings from Standard and Poor's Corporation ("S&P"), which the Association received in 1974; from Moody's Investors Service, Inc. ("Moody's"), which the Association received in 1984; from Fitch, Inc. ("Fitch"), which MBIA Corp. received in 1995."

23.     MBIA's capital cushion, or the capacity to pay claims if needed, is a chief concern of the rating agencies in maintaining MBIA's triple-A rating. Generally, rating agencies compare loss reserves to exposure to risky securities, since a sharp increase in losses threatens capital cushion. Consequently, it was necessary for MBIA to disclose its entire portfolio, because its exposure to risky securities is potentially sufficient to wipe out MBIA's loss reserves, capital and with it MBIA's triple-A rating.

6

24.     Since 2002, and throughout the Class Period, MBIA has maintained a constant loss reserve rate of 12 percent of new insurance premium income. MBIA has justified this low loss reserve rate by claiming an expertise in assessing risk. However, for most of its history, MBIA received the majority of its earnings by insuring low risk municipal bonds.

25.     During the past ten years, however, MBIA has shifted away from municipal bond insurance and into higher risk structured finance. About half of MBIA's structured finance portfolio comprises guarantees of complex financial instruments known as CDOs.

26.     Even as its exposure to structured finance securities rapidly expanded, MBIA continued to claim expertise in assessing risk and maintained MBIA's loss reserve rate of 12 percent. Accordingly, investors believed that the credit risk associated with the insurance portfolio had remained constant.

**Materially False and Misleading
Statements Issued During the Class Period**

27.     The Class Period begins on January 30, 2007. On this day, MBIA issued a press release announcing its financial results for the year ended December 31, 2006. The announcement noted an 81 percent increase in total premiums earned on structured finance insurance, but the loss reserve rate of 12 percent remained unchanged. Additionally, the Company, in relevant part, stated:

> Overall credit quality in the insured portfolio remained high, with 81 percent of the total book of business rated A or better, unchanged from the end of 2005. The percentage of the portfolio rated non-investment grade decreased to 1.9 percent from 2.1 percent in 2005, with about half of the reduction resulting from a decrease in the par amount of non-investment grade rated credits and the other half resulting from the growth of the outstanding book of business.

28.     On this same day, MBIA held an earnings conference call with investors and financial

analysts. During this call, Defendant Chaplin stated that "we have seen a pretty material improvement in the quality of the portfolio, and therefore its capital requirement." Commenting on MBIA's CDO portfolio, Chaplin stated that "[o]ur CDO portfolio is in pretty good shape. It's $95 billion in par outstanding...but I would just remind that, you know, a huge percentage of that portfolio is AAA in credit quality."

29.    On March 1, 2007, MBIA filed its Annual Report with the SEC on Form 10-K. The Company's 10-K was signed by Defendants Dunton and Chaplin, and reaffirmed the Company's financial results previously announced on January 30, 2007. The Company's 10-K also included Sarbanes-Oxley certifications signed by the Individual Defendants. In their respective certifications, the Individual Defendants represented, among other things, that:

> I, [Gary C. Dunton and C. Edward Chaplin], certify that:
>
> 1.    I have reviewed the Annual Report of MBIA Inc. (the "Company") on Form 10-K for the period ending December 31, 2006 as filed with the Securities and Exchange Commission on the date hereof (the "Report");
>
> 2.    Based on my knowledge, this Report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this Report;
>
> 3.    Based on my knowledge, the financial statements, and other financial information included in this Report, fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, the periods presented in this Report;
>
> 4.    The Company's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as

defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the Company and have:

    a.    designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this Report is being prepared;

    b.    designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c.    evaluated the effectiveness of the Company's disclosure controls and procedures and presented in this Report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this Report based on such evaluation; and

    d.    disclosed in this Report that there were no changes in the Company's internal control over financial reporting that occurred during the Company's fourth quarter of 2006 that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting; and;

5.    The Company's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Company's auditors and to the audit committee of the board of directors:

    a.    all significant deficiencies and material weaknesses in the design or operation of internal control over

financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information; and

b.     any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

* * *

In connection with the Annual Report of MBIA Inc. (the "Company") on Form 10-K for the period ending December 31, 2006 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, [Gary C. Dunton, Chief Executive Officer of the Company and C. Edward Chaplin, Chief Financial Officer of the Company], certify, pursuant to 18 U.S.C. § 1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 2002, that:

1.     The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2.     The information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company.

30.     On March 6, 2007, MBIA held an earnings conference call with investors and financial analysts. During this call, Defendant Chaplin stated that "[w]e have subprime mortgage exposure, which comes in two flavors, direct and structured CDOs. Our direct exposure is $5.8 billion." Defendant Chaplin also stated that "[w]e have $16.6 billion of par value in multi sector CDOs. So there is $2.4 billion of subprime collateral inside of those multisector CDOs." In response to a question about loss reserves, Defendant Chaplin stated that "our reserves are adequate for the book of our business."

31.     On April 26, 2007, MBIA announced its earnings for the first quarter of 2007. The

announcement noted a 118 percent increase in total premiums earned on structured finance insurance. Nonetheless, the loss reserve rate remained unchanged at 12 percent. Additionally, the Company, in relevant part stated:

> The overall credit quality in the insured portfolio remained high with 82 percent of the total book of business rated A or better compared with 81 percent in the first quarter of 2006. The percentage of the portfolio rated below-investment grade decreased to 1.9 percent from 2.1 percent in the same period-end last year.

32.     On this same day, MBIA held an earnings conference call with investors and financial analysts. During this call, Defendant Chaplin stated that "our subprime mortgage exposure [...] totaled $5.4 billion at quarter end or less than 1% of the outstanding book of business."

33.     On May 4, 2007, MBIA filed its Quarterly Report with the SEC on Form 10-Q. The Company's 10-Q was signed by Defendants Dunton and Chaplin, and reaffirmed the Company's financial results previously announced on April 26, 2007. The Company's 10-Q also contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶29, *supra*.

34.     On July 26, 2007, MBIA announced its earnings for the second quarter of 2007. Once again, MBIA reported a significant increase in structured finance insurance, but the loss reserve rate remained unchanged at 12 percent. Additionally, the Company, in relevant part, stated:

> Second quarter production for MBIA's global structured finance was the highest quarterly structured finance ADP production in the Company's history, rising 181 percent compared to the second quarter of 2006. U.S. structured finance ADP increased 170 percent compared to 2006, and non-U.S. structured finance production was up 203 percent.

Defendant Dunton, in relevant part, stated:

11

> Market conditions improved in the first half of the year as demand
> grew for our product and wider credit spreads improved pricing
> opportunities in certain segments. In addition, the quality of our
> insured portfolio has improved significantly, as several problem
> credits have been successfully remediated and our new business
> has high underlying ratings. We have carefully reviewed our
> credits backed by residential mortgages and remain comfortable
> with our exposure to that sector.

35.     On August 2, 2007, MBIA held a conference call "to answer questions concerning MBIA's subprime RMBS exposure, CDO exposure and related topics." During this conference call, Defendant Chaplin stated that the total amount of CDOs underwritten by the company with some exposure to RMBS was $15.9 million. Defendant Chaplin also stated that MBIA had approximately $6.1 billion in net par exposure to CDO-squared securities. The Company never disclosed that any part of the $6.1 billion in CDO-squareds contained RMBS exposure.

36.     On August 8, 2007, MBIA filed its Quarterly Report with the SEC on Form 10-Q. The Company's 10-Q was signed by Defendants Dunton and Chaplin, and reaffirmed the Company's financial results previously announced on July 26, 2007. The Company's 10-Q also contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶29, *supra*.

37.     On October 25, 2007, MBIA announced its earnings for the third quarter of 2007. Once again, MBIA reported a significant increase in structured finance insurance, but the loss reserve rate remained unchanged at 12 percent. Additionally, the Company, in relevant part, stated:

> The overall credit quality of the insured portfolio remained high
> with 82 percent of the total book of business rated A or better as of
> September 30, 2007. The percentage of the portfolio rated below
> investment grade on an S&P priority basis decreased to 1.4 percent
> as of September 30, 2007 from 2.2 percent as of September 30,
> 2006.

Defendant Dunton, in relevant part, stated:

> We remain comfortable that our insured credit derivatives portfolio will not result in material credit losses. More important, wider spreads contributed to a substantially better pricing environment for our insurance and asset/liability management products. From an Adjusted Direct Premium production standpoint, the third quarter was outstanding - the Company's second best quarter ever and the best quarter for our structured finance business. Pricing was strong across many sectors, and the credit quality of our new business was very high.

38.     On the same day, MBIA held an earnings conference call with investors and financial analysts. During this call, Defendant Chaplin stated that "[w]e remain very comfortable with our subprime RMBS related exposures." Chaplin also said that the total amount of the Company's CDOs that contained RMBS had increased to $19 billion at the end of the third quarter.

39.     The statements contained in ¶¶ 27 – 38 were materially false and misleading when made because Defendants failed to disclose or indicate the following:  (1) that the Company had materially under-reported its exposure to CDO-squareds and RMBS; (2) that the Company had far greater exposure to a potential ratings downgrade from the credit ratings agencies than it had previously disclosed; (3) that the Company had materially underestimated loss reserves; (4) that, as a result of the above, the Company's financial statements were materially false and misleading at all relevant times; (5) that the Company lacked adequate internal and financial controls; and (6) that, as a result of the foregoing, the Company's statements about its financial well-being and future business prospects were lacking in any reasonable basis when made.

## The Truth Begins To Emerge

40.     On December 19, 2007, after the market closed, MBIA issued a press release entitled "Standard & Poor's Affirms Triple-A Ratings for MBIA Insurance Corporation and Changes Outlook to Negative." In the press release, the Company noted that its triple-A rating was in jeopardy and directed investors to a new report on its website. On the website, MBIA finally disclosed its true RMBS exposure "to make it consistent with the CDOs that were included in Standard & Poor's analysis." MBIA revealed that the Company's total CDOs with RMBS exposure was $30.4 billion. This figure is nearly twice the amount reported in the August 2, 2007 analyst presentation and more than $11 billion more than the Company reported in its October 25, 2007 conference call.

41.     The Company's website also revealed that $8.14 billion of MBIA's portfolio consists of CDOs backed by a combination of other CDOs and RMBS, These securities, known as CDO-squareds, are generally considered to be among the riskiest securities in the market. In response to the December 19, 2007 disclosures, MBIA shares plunged over 26 percent on extremely heavy trading volume, falling from $27.02 at the close on December 19, to $19.95 per share by the close on December 20.

42.     Following the Company's December 19, 2007 disclosures, Morgan Stanley analysts, Ken Zerbe and Yoana Koleva, issued a report that evening. The report, in relevant part, stated:

> MBIA published an updated list of its CDO exposures. It disclosed that it has a massive $8.1 billion of exposure to CDO-squared transactions (where the underlying collateral is more than 75% CDOs and the remainder is mostly RMBS). Of the total, $5.1 billion was written in 2006 and 2007. We are shocked that management withheld this information for as long as it did.

14

\* \* \*

> MBIA simply did not disclose arguably the riskiest parts of its CDO
> portfolio to investors: $8.1 billion of CDO-squareds.

43.     Kathleen Shanley, an analyst with Gimme Credit, said the "eleventh-hour" disclosure

by MBIA "ignites concerns all over again about the prospect for future losses." Shanley said that

prior to the disclosure, investors lacked information about the Company's exposure to the "riskiest

type of CDO," CDO-squareds.

44.     Michael Grasher, a Piper Jaffray analyst said that "[i]t's surprising…considering

others have disclosed their CDO-squareds for a couple of months now."

45.     Robert Haines, an analyst with CreditSights, said "[i]t questions my confidence about

how upfront the company is being and has been…That's [CDO-squared] the asset class that

everyone has been scrambling about."

46.     On December 20, 2007, S&P analyst Catherine Seifert reduced her rating on MBIA

from hold to sell, noting that "[w]e share the market's dismay that this revelation changes the risk

profile of MBI as compared with its financial guaranty peers."

47.     Then, on December 21, 2007, MBIA issued a press release disclosing that Fitch had

placed MBIA on Rating Watch Negative and indicated that the Company would lose its triple-A

rating unless it could raise $1 billion in additional capital to cover anticipated claims.  Fitch gave

MBIA four to six weeks to raise the additional capital.

48.     On January 8, 2008, Ken Zerbe "cut his fourth-quarter estimate to a loss of $2.09 per

share."  On this news, MBIA shares declined 21 percent, from an opening price of $18.07 per share

to a closing price of $13.98.

15

49.    On January 9, 2008, MBIA filed a form 8-K with the SEC.  In the 8-K, MBIA admitted that it had not allocated sufficient loss reserves.  Furthermore, the 8-K disclosed that the SEC had inquired into MBIA's disclosure of its exposure to RMBS.  The Company, in relevant part, stated:

> The Company has recently had discussions with and has provided information on a voluntary basis to the New York Insurance Department ("Department") and the Securities and Exchange Commission ("SEC") in response to informal inquiries with respect to certain matters, including the Warburg Pincus transaction, the Company's announcement of preliminary loss reserve estimates on December 10, 2007 related to MBIA's residential mortgage-backed securities exposure and disclosures regarding MBIA's CDO exposure.

> * * *

> [A]s of January 8, 2008, we estimated that we would establish case basis loss reserves of $614 million under GAAP and $814 million under SAP and a special increase to unallocated loss reserves of $100 million under GAAP due to projected inadequacies of such credit enhancements in securities it has guaranteed. The special increase to unallocated loss reserve is in addition to MBIA's regular quarterly addition of 12% of scheduled earned premiums, or approximately $23 million in the fourth quarter of 2007. We expect the after-tax effect of the establishment of such SAP reserves to eliminate MBIA's net income and produce a loss for the fourth quarter and possibly for 2007 under SAP.

> * * *

> Many of the subordination provisions, credit enhancements and other contractual provisions of the RMBS, CMBS and CDOs of ABS MBIA insures are untested in the market.

50.    Also on January 9, 2008, MBIA announced in a press release that it would report a loss of $737 million for the fourth quarter.  Furthermore, MBIA announced that, in an effort to preserve capital and its triple-A rating, it was cutting its dividend from 34 cents to 13 cents.

## LOSS CAUSATION

51.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated MBIA's stock price and operated as a fraud or deceit on Class Period sellers of MBIA put options.  When the truth concerning MBIA's exposure to RMBS entered the market beginning December 19, 2007, MBIA's stock price fell drastically, thus damaging sellers of MBIA put options.

52.     On December 19, 2007, MBIA issued a press release disclosing that its CDOs with RMBS exposure was $30.4 billion, nearly double the amount previously reported.  As a result of this disclosure, MBIA's stock price declined 26.2%, from $27.02 to $19.95.

53.     It was reasonably foreseeable that the materialization of the undisclosed risk regarding MBIA's true exposure to RMBS would cause the price of MBIA's stock to drop precipitously and would damage sellers of MBIA put options.

54.     The steep decline in MBIA's stock price at the end of the Class Period was a direct result of the Defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of MBIA's stock price declines negate any inference that the loss suffered by Plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors, or company specific facts unrelated to the Defendants' fraudulent conduct.  Defendants' misrepresentations during the Class Period were the proximate cause of Plaintiff's losses.

## SCIENTER ALLEGATIONS

55.     As alleged herein, Defendants acted with scienter in that Defendants knew that the statements issued or disseminated in the name of the Company were materially false and misleading;

17

knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated in or acquiesced to the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding MBIA, their control over and/or their associations with the Company which made them privy to confidential proprietary information concerning MBIA, participated in the fraudulent scheme alleged herein.

## FRAUD ON THE MARKET DOCTRINE

56.     At all relevant times, the market for MBIA's securities was an efficient market for the following reasons, among others:

(a)     MBIA's securities met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     As a regulated issuer, MBIA filed periodic public reports with the SEC and the NYSE;

(c)     MBIA regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     MBIA was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these

18

reports was publicly available and entered the public marketplace.

57.     As a result of the foregoing, the market for MBIA's securities promptly digested current information regarding MBIA from all publicly-available sources and reflected such information in the price of MBIA's securities.  Under these circumstances, all Class members suffered similar injury through their transactions in MBIA's securities at/or affected by artificially inflated prices and a presumption of reliance applies.

## FIRST CLAIM

### For Violations Of Section 10(b) Of
### The Exchange Act And Rule 10b-5 Promulgated Thereunder
### (Against All Defendants)

58.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

59.     During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to transact in MBIA securities at/or affected by artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

60.     Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for MBIA securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

19

All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

61.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of MBIA as specified herein.

62.     Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about MBIA and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of MBIA securities during the Class Period.

63.     Each of the Individual Defendant's primary liability, and controlling person liability, arises from the following facts: (a) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (b) each of these Defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (c) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to other members of the Company's management

20

team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (d) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

64.     Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing MBIA's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by Defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

65.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of MBIA securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of MBIA's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class suffered injury through their transactions

in MBIA securities during the Class Period at/ or affected by artificially high prices.

66.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

67.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

### SECOND CLAIM

**Violation Of Section 20(a) Of
The Exchange Act Against the Individual Defendants**

68.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

69.     Defendants Dunton and Chaplin acted as controlling persons of MBIA within the meaning of § 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the Company, their ownership of MBIA stock, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Defendants Dunton and Chaplin had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading. Defendants Dunton and Chaplin were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

22

70.    Defendants Dunton and Chaplin were each culpable participants in the violations alleged above by their acts and omissions.  As a direct and proximate result of their wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

71.    Therefore, Defendants Dunton and Chaplin are each liable jointly and severally with and to the same extent as MBIA for MBIA's violations of § 10(b) of the Exchange Act.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

(b)    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: March 6, 2008
      New York, New York

MURRAY, FRANK & SAILER LLP

Marvin L. Frank (MF 1436)
275 Madison Avenue, 8th Floor
New York, NY 10016
Telephone:    212-682-1818
Facsimile:    212-682-1892

## CERTIFICATION

I, Gary Kosseff, do hereby certify that:

1. I have reviewed the complaint and have authorized its filing.

2. I purchased the securities of MBIA, Inc., which are the subject of the complaint, *but not* at the direction of my counsel or in order to participate in any private action arising under the Securities Act of 1933 or Securities Exchange Act of 1934, as amended by the Private Securities Litigation Reform Act of 1995.

3. I am willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4. In the three years prior to this certification, I filed a class action complaint against:

Fox Entertainment (*Gary Kosseff v. Fox Entertainment*, 05-cv-1942 (S.D.N.Y.))
Merrill Lynch & Co. ( *Gary Kosseff v. Merrill Lynch & Co.*, 07-cv-10984 (S.D.N.Y.))

5. During the Class Period, January 30, 2007 to January 9, 2008, I engaged in the following transactions:

### TRANSACTION INFORMATION

| BUY OR SELL | TRADE DATE | QUANTITY | PRICE |
|---|---|---|---|
| Sold Put Options $35.00 - Jan'09 | 5/30/07 | 2 | $1.25 |

6. I will not accept any payment for serving as a representative party on behalf of the Class beyond my *pro rata* share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class and my activities in the lawsuit, as ordered or approved by the Court.

7. Nothing herein shall be construed to be or constitute a waiver of my attorney-client privilege.

8. I certify under penalty of perjury that the foregoing is true and correct.

Executed on 3 / 5 / 2008.        Signature _Gary Kosseff_
                                          Gary Kosseff